# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3880

_____

Equal Employment Opportunity     *
Commission,     *
    *
         Appellant,     *
    *   Appeal from the United States
      v.     *   District Court for the
    *   District of Minnesota.
Kelly Services, Incorporated,     *
    *
         Appellee.     *

_____

Submitted: October 21, 2009
Filed: March 25, 2010

_____

Before MELLOY, SMITH, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC) brought suit against Kelly Services, Inc. ("Kelly"), an employment agency that places temporary employees with businesses, alleging that Kelly discriminated against Asthma Suliman, a Muslim, by failing to refer her to Nahan Printing, Inc. ("Nahan") for employment because of Suliman's refusal to remove her khimar[1] for work at the commercial

_____

[1]A khimar is "a traditional garment worn by Muslim women which covers the hair, forehead, sides of the head, neck, shoulders, and chest and sometimes extends down to the waist." *Webb v. City of Phila.*, Civil Action No. 05-5238, 2007 WL

printing company. The district court[2] granted summary judgment to Kelly, and we now affirm.

## I. *Background*

Kelly is a temporary employment agency that places workers in temporary positions with its clients' businesses. Kelly conditionally hires individuals and assigns them to temporary jobs based on their clients' specified requirements and fluctuating needs. Nahan, a commercial printing company, contracts with Kelly for temporary workers. Nahan operates an industrial plant with large machines. The machines pull paper into printing presses using conveyor belts with rollers, sorting and "jogging"[3] machines, binding machines, and packaging machines. All of this machinery uses fast-moving parts that pose a safety risk to workers wearing loose-fitting clothing or headwear should it become entangled in the machinery. Nahan requires all temporary workers to work along the assembly line, which places these workers in close proximity[4] to rollers, chains, and moving parts. Workers stand near these machines at about waist height or mid-torso level. Nahan requires that temporary workers be able to perform all jobs.

Nahan has a dress policy that applies to all workers—permanent and temporary. The policy prohibits headwear and loose-fitting clothing. The dress policy seeks to prevent loose apparel from getting caught in the machinery's moving parts and

_____

1866763, at *1 (E.D. Pa. June 27, 2007) (unpublished).

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[3]A "jogging" machine works to quickly shake a stack of printed materials to ensure that the edges are flush so that the cutting machines cut the material in an even fashion and to correct dimensions.

[4]"Close proximity" at Nahan is defined as within one foot of the machinery, fast-moving parts, conveyor belts, and rollers.

injuring workers. Nahan strictly and uniformly enforces its dress policy to all employees. Nahan has previously sent home Kelly-supplied, non-Muslim temporary workers before the end of their shifts for violating the dress policy. And, Kelly has referred other individuals believed to be Muslim to Nahan, and these individual complied with Nahan's dress policy.

In July 2004, Suliman, a Muslim, applied at Kelly for temporary employment. As a part of her Muslim faith, Suliman wears a khimar. On August 5, 2004, Suliman took and passed a skills test at Kelly. On August 10, 2004, Suliman met with Sarah Corrieri, a staffing supervisor, to discuss potential opportunities for a temporary assignment. Corrieri mentioned placing Suliman on the production floor at Nahan. Corrieri does not recall whether there was a specific opening at Nahan on August 10, 2004, for which she could place Suliman.[5] The apparent purpose of Corrieri advising Suliman about job opportunities at Nahan was to evaluate Suliman's eligibility to work at Nahan in the event that a position became available.[6]

Corrieri showed Suliman the Nahan brochure and reviewed all the sections of the brochure with her, including the dress policy. Corrieri considered Suliman's khimar to be "headwear" under the dress policy. Corrieri understood Nahan's headwear prohibition to be a safety-based policy and that it excluded *all* headwear—even religious headwear. She reached this conclusion through her training at Kelly on Nahan's employment requirements. Corrieri believed that a temporary

---

[5]The EEOC has not provided any evidence to show that a position at Nahan was available on August 10, 2008.

[6]Corrieri explained "[h]ow the hiring process works," stating that "if [an applicant] pass[es] the evaluations, which [Suliman] did, she's considered a conditional-hire person, so anytime there's an opening she's ready to go." Corrieri "d[id]n't recall if there was a specific opening at the time that [Suliman] was sitting at the desk" but stated that "[Suliman] would be eligible to work any opening that would come available."

worker would have to remove his or her religious headwear to work at Nahan. As a result, Corrieri informed Suliman, "You will have to take your scarf off—you cannot cover your hair." Suliman replied that she could not remove the khimar because her religion required her to wear it. Corrieri repeated that Suliman would have to take the khimar off for safety reasons if she desired to work at Nahan, explaining to Suliman that the khimar could become entangled in a machine and injure her. Corrieri's coworker, Brandi Bruns, agreed with Corrieri, stating that Suliman "cannot have the job until she uncovers her hair." Corrieri told Suliman, "I'm sorry. You have to make a wise choice."

Corrieri did not consider contacting Nahan to find out whether Nahan could accommodate Suliman, nor did she discuss with Suliman the possibility of Suliman tying back the khimar. Corrieri had previously visited Nahan and knew the dangerous nature of its machinery. She explained, "I was going to—[b]ecause that was a—something that I knew was a safety concern working with Nahan knowing the equipment that's at Nahan and that it would be a safety concern for her wearing that there." Corrieri believed that Suliman's clothing "could have been pulled into a machine causing severe damage to her." Corrieri noted that Suliman's khimar was "all the way around her body." And, although Corrieri was aware that certain jobs at Nahan did not require an employee to work on or near machinery, she explained that those jobs are "sometimes available, not always available." Corrieri did not inquire of Nahan as to whether such positions were available that day for Suliman or whether Nahan could move other employees to other positions to accommodate Suliman. Corrieri did not consult with anyone else before concluding that Suliman was not a "candidate for employment at Nahan Printing."

When Corrieri informed Suliman that she did not meet the safety requirements to work at Nahan, Suliman did not appear upset. She simply replied "okay" and left the office. Suliman then informed her husband that Kelly refused to refer her to Nahan because of her khimar. Her husband immediately went to Kelly with Suliman to speak

with Corrieri. Corrieri explained to him that Suliman could not work at Nahan with her hair covered and pointed to a rule in Nahan's handbook, which Kelly had cowritten with Nahan, which states "no hats, no caps." The handbook also stated that the guidelines in the handbook were "to be administered in a way that does not discriminate against persons due to sex, race, disability, veteran status, or religion. We realize there may be individual circumstances where these guidelines may need to be modified." Corrieri did not discuss this provision with Suliman and her husband. Suliman's husband told Corrieri that the khimar was neither a hat nor a cap but was a religious requirement and that Kelly's refusal to refer Suliman to Nahan was religious discrimination. The option of tying the khimar back in some fashion was never discussed. Both Corrieri and Bruns repeated that Suliman could not work at Nahan with the khimar.

Later, Corrieri informed Kelly's Branch Manager, Julie Hentges, about the incident with Suliman. She explained to Hentges that she asked Suliman to remove her khimar, but Suliman told her that she could not remove it. Corrieri described how she told Suliman that she would not be allowed to work at Nahan. Corrieri also advised Hentges that Suliman's husband came in the office and that Corrieri was concerned because he was very upset. Corrieri told Hentges that she tried to explain to Suliman's husband that Kelly was following Nahan's safety guidelines. Hentges had previously told Corrieri that no one would be allowed to wear anything on their head while working at Nahan because of safety concerns about headwear getting caught in the machinery.

According to Hentges, she had merely communicated to Corrieri what Nahan had previously communicated to Kelly. Kelly obtained that directive from Nahan at the start of its business relationship with Nahan. According to Hentges, Jackie Olson, Nahan's employee relations leader, previously told Hentges that anything covering the

head was prohibited at Nahan. According to Hentges, on a prior occasion[7], she had asked Olson about an employee wearing a head scarf because she wanted to know if that was included in the policy, and Olson replied that Nahan's "policy is nothing can be worn on the head because of safety."

After speaking with Corrieri, Hentges called Kelly's corporate office, and she spoke to Sharon Woods, Kelly's regional manager for human resources. Woods informed Hentges that she needed to ask Olson whether Suliman could tie back her khimar. Woods also advised Hentges to offer Suliman other work because its Kelly's policy, as Kelly had conditionally hired Suliman. According to Hentges, she then called Olson at Nahan to ask whether Suliman could work there if she tied back her khimar like people with long hair are allowed to do. Hentges maintains that Olson said that the khimar would pose a safety risk even if it was tied back. Hentges did not ask why a tied-back khimar would pose more of a safety risk than tied-back hair, nor did she suggest to Olson that tying back the khimar could be a potential accommodation to Suliman's religion.

---

[7]Hentges asked about the head scarf because an individual was wearing one who had applied for a position with Nahan, and Hentges wanted to see if that individual could go to work at Nahan. Olson did not ask Hentges why the person wore a scarf on her head, and Hentges did not ask the individual why she needed to wear the scarf. Hentges did not know what religion that individual practiced. When Hentges spoke with Olson about the individual wearing the head scarf, there was a discussion about whether the individual could tie back her scarf, as Nahan's policy stated that, when in production, long hair needs to be tied back to stay away from the front of the employee's face. Olson responded that the head scarf was a concern for safety because it could get stuck in a machine; it would violate the dress code that states nothing can be worn on an employee's head. Hentges did not ask Olson how it was that Nahan permits people with long hair to tie it back to keep it away from their face, yet Nahan would not allow an individual to tie back her scarf as other people tie back their hair. Ultimately, Hentges never asked the individual to remove her head scarf in order to work at Nahan, and Hentges did not send that individual to Nahan because of the information that she received from Olson, but she did offer the individual other work.

When asked whether she had ever spoken with anyone at Kelly about an applicant's need for religious accommodation at Nahan, Olson replied that "[t]here was an individual Stephanie Lateral that was filling in for [Hentges] and had asked if an individual could tie her khimar back and still be within the guidelines to work [at Nahan], and we said no." This occurred in 2005. Thereafter, Olson was again questioned about her conversation in 2005 with Lateral. When asked what she recalled about that discussion, she testified:

> I recall asking Stephanie if an individual had been placed at Nahan, because I had heard from somebody in our manufacturing facility that there was someone that had a skirt on. And so I had called Stephanie to ask if that was true because I don't place who the individuals are, so I was following up on a question that was asked to me by a supervisor.

According to Olson, Lateral told her that there was an individual that was wearing a skirt. Olson did not "recall the specifics if a khimar was involved or not, but [Olson] had told [Lateral] that based off [Nahan's] policy for safety purposes that the individuals weren't allowed to wear that type of attire." Nothing from Olson's conversation with Lateral indicated that this skirt was related to the Muslim religion. Olson never talked about this incident with Hentges.

When asked whether Olson had ever spoken with Hentges about an applicant's need for religious accommodation, Olson stated, "Not that I recall." But Olson admitted that she had previously spoken about the dress policy with Hentges, stating:

> When we put the information together in the packets, we had talked about hats, caps, headwear. *Julie had raised the question are khimars allowed*, and we had indicated because of safety purposes, again, for the employees' purpose, the individuals that we work with and for machine purposes that we weren't—wouldn't allow the employee to do that.

She had indicated that she needed to talk to corporate counsel and she would get back to me.

(Emphasis added.) Olson explained that Nahan's dress policy prohibits hats and caps because the employees work around moving parts and that safety risks exist to the individual employee and his or her coworkers. According to Olson, all employees work around this equipment, as the majority of the areas in Nahan have moving equipment. Olson stated that Nahan has never granted a modification to its dress policy for a temporary employee at Kelly or any other temporary agency. When asked whether a woman wearing a khimar could tie her khimar back in order to comply with the dress code, Olson said no. She stated that khimars were not allowed for safety reasons, just as hats and caps are not allowed. When asked how a khimar is different from tying long hair back, which is mandated under the dress code, Olson replied, "Because your hair is permanent. It sticks to your head." She said that a khimar is different from hair because of the risk that the khimar, like a hat, could fall off. Olson testified that if the khimar fell off, the risk would be "[r]eaching in and trying to grab it, pulling an individual into the piece of equipment, damaging equipment, or other individuals that are trying to help could potentially be hurt as well."

Based on her alleged conversation with Olson about Suliman, Hentges did not pursue the possibility of referring Suliman to future job openings at Nahan. Kelly subsequently offered to place Suliman in at least seven different jobs, all of which could safely be performed while wearing a khimar. In each instance, Suliman told Kelly that she would need to check with her husband before accepting any placements. Suliman declined all other temporary jobs that Kelly offered.

Suliman filed a charge of discrimination, alleging that Kelly had discriminated against her by refusing to refer her to Nahan. An investigator from the Minnesota Department of Human Rights contacted Nahan to learn more about the work environment and asked to speak to a shift leader. The shift leader was not present.

Instead, the investigator spoke with Doug Karls, a stitcher operator. Karls's job was not a supervisory position; instead, he gave direction to the helpers on his machine as to how he wanted the task performed. As a stitcher operator, Karls reported to Kevin Schultzetenberg, the shift leader. But on the day that the investigator spoke with Karls, he was filling in for a shift leader.

The investigator asked Karls whether there was a no-hat policy at Nahan, and Karls responded that employees are not allowed to wear headgear of any type. Karls explained to the investigator that the policy was in place for safety reasons and professionalism. With regard to safety, Karls informed the investigator that "a hat could fall off into a piece of equipment, someone could get hurt trying to reach for the hat, pulling it out of the equipment." The investigator then asked Karls whether Nahan had any Muslim workers, and Karls said yes. The investigator asked Karls if Nahan had any female Muslims working at Nahan, and Karls stated that Nahan did have such workers and that there was a Muslim female working at Nahan that day. The investigator inquired as to whether Karls asked the Muslim female to remove her headdress, and Karls said that he did not. As acting shift supervisor that day, Karls believed that it could have been his job to ask the Muslim female to remove the headgear, but he did not ask her to remove it because he "assumed it was a religious situation." He understood that if it were for a religious reason, he would have to let her wear it. Karls based this understanding on Nahan's handbook that states that Nahan does not discriminate against religion.

Nevertheless, Karls was concerned that the Muslim female's clothing put her in danger because "her clothing could get caught in the machine." Karls referenced the woman's "clothing" because she was actually wearing "a full gown" that was "like a dress." The garment covered both her hair and her body, and the garment was loose and touched the floor. Karls was not concerned about the head covering; instead, he was concerned about the loose clothing, as the woman was working on the end of the stitcher filling boxes. He moved her from that position because of "a possible safety

hazard with the tape machine" to the cutter, where she was stacking paper. Karls did not have a problem moving the woman because he had moved other employees around that day. When Karls spoke with the investigator, he had no responsibility to decide anything about religious accommodations or who could wear a khimar; he also expressed that safety was the paramount concern and that this occasion was the only time that he had ever seen anyone similarly attired on the production floor. Karls advised the investigator to call back to speak with Jim Olson, Nahan's head of human resources.

Karls reported his conversation with the investigator to Jim Olson. He told Olson that the investigator had asked him whether he had told the woman wearing a khimar to take it off and that he had said he did not because "I thought it was a religious situation and Nahan does not discriminate against religion." Karls testified that he left his conversation with Olson feeling that he had done the right thing. He said that Olson did not tell him that he was wrong for permitting the woman to wear the khimar while she worked.

The EEOC filed suit against Kelly, and Kelly moved for summary judgment, arguing that the EEOC could not prove a prima facie case of discrimination and that, in any event, it would have been an undue hardship to send Suliman to Nahan because Suliman could not meet Nahan's safety requirements. The EEOC argued in response that Kelly had violated the central prohibition of Title VII governing employment agencies. The EEOC also argued that because Nahan had safely accommodated at least one other temporary employee who wore a khimar, the record raised a question of fact about whether Nahan could safely have accommodated Suliman. The EEOC maintained that Kelly had not satisfied its obligation to investigate the question before refusing to refer Suliman to Nahan.

The district court granted Kelly's motion for summary judgment on three grounds. First, the court found that the EEOC failed to establish a prima facie case of

religious discrimination. Specifically, the court found that the EEOC failed to show that Suliman suffered an adverse employment action. According to the court, the record reflected that Kelly offered Suliman temporary employment at least seven different times. The court opined that "Suliman did not have a guarantee or reasonable expectation of being placed with any particular employer. Rather, she was conditionally hired by Kelly to perform temporary work on an as-needed basis for its client businesses." Therefore, the court concluded that "Suliman's refusal to accept any of the multitude of jobs Kelly offered her cannot be seen as an adverse employment action for which Kelly should now be liable."

Next, the court determined that even if the EEOC had proven a prima facie case of religious discrimination, Kelly reasonably accommodated Suliman by offering Suliman several other jobs. Finally, the court found that the record "clearly demonstrates that Nahan's dress policy prohibiting head coverings of any kind is safety-based and strictly enforced," meaning that Nahan could not have safely accommodated Suliman without undue hardship.

## II. *Discussion*

The EEOC asserts that the district court erroneously granted summary judgment to Kelly because a reasonable jury could conclude that Kelly discriminated against Suliman. According to the EEOC, Title VII required Kelly to refer Suliman to Nahan without reference to the khimar unless Nahan could not reasonably accommodate Suliman's religious need to keep her head covered. The EEOC maintains that Kelly's Title VII obligations as an employment agency were independent of Nahan's obligations under Title VII, meaning that Kelly cannot rely on Nahan's generalized statements about safety to preclude the possibility of a religious accommodation for a particular individual. The EEOC argues that Kelly had a duty to investigate whether Nahan's generalized rules could have been safely modified to accommodate Suliman. Kelly violated this duty by failing to investigate whether Nahan could have assigned

Suliman a job away from moving machinery or whether she could have worked safely at Nahan if she had tied back her khimar.

In response, Kelly argues that the district court properly granted it summary judgment. According to Kelly, in light of (1) the industrial nature of Nahan's workplace and the safety hazards resulting from the fast-moving machines and conveyor belts and (2) Nahan's business requirement that any temporary worker be able to perform all jobs at Nahan, Suliman was correctly disqualified for placement at Nahan. Kelly points out that Suliman was offered several other alternative assignments, all of which she refused. Therefore, Kelly contends that because Suliman was not qualified to work safely at Nahan, and because she refused alternate job assignments, Suliman suffered no adverse employment action. As a result, Kelly asserts that the district court correctly determined that the EEOC did not establish a prima facie case.

In the alterative, Kelly argues that even if the EEOC established a prima facie case, Kelly could not reasonably accommodate Suliman without undue hardship in light of Nahan's neutral and strictly enforced safety-based dress code. According Kelly, prior to Suliman's first contact with Kelly, Nahan had made it clear to Kelly that, for safety reasons, there could be no waiver of its safety-based dress policy requiring no loose clothing and no headwear of any sort. Kelly notes that Nahan had previously rejected non-Muslim temporary workers that Kelly referred to it for the workers' failure to comply with this policy and that workers believed to be Muslim, who could comply with this policy, were successfully placed at Nahan without issue.

It is illegal "for an employment agency to *fail or refuse to refer for employment*, or otherwise to discriminate against, any individual because of his . . . religion . . . ." 42 U.S.C. § 2000e-2(b) (emphasis added). An "employment agency" is "any person regularly undertaking with or without compensation to procure employees for an

employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." *Id.* § 2000e(c).

An employment agency's referral obligations under § 2000e-2 is a question of first impression for this court. In cases involving alleged religious discrimination by an *employer* against an employee, we have explained that

> [t]o establish a prima facie case of religious discrimination, a plaintiff must show he (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of such conflict, and (3) suffered an adverse employment action. If the plaintiff establishes these elements, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. Thereafter, the burden shifts back to the plaintiff to show the reason offered by the employer is pretextual.

*Ollis v. HearthStone Homes, Inc.*, 495 F.3d 570, 575 (8th Cir. 2007) (internal citations omitted).

In this case, neither party disputes the sincerity of Suliman's religious beliefs or that Suliman advised Kelly that she could not remove her khimar for religious reasons. Therefore, the only question is whether an employment agency's failure to refer an applicant may constitute an "adverse employment action."

The plain language of § 2000e-2(b) states that an employment agency violates Title VII if it "fail[s] or refuse[s] to refer for employment . . . any individual because of his . . . religion . . . ." "The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . ." *Id.* § 2000e(j). Therefore, the plaintiff must show that the employment agency discriminated against her "based on her [religion] in relation to referrals." *Williams v. Caruso*, 966 F. Supp. 287, 297 (D. Del. 1997) ("Giving [the plaintiff] the benefit of all reasonable inferences, there are no

allegations that [the employment agency] discriminated against [the plaintiff] based on her sex in relation to referrals.").

Here, the EEOC alleges that Kelly's refusal to refer Suliman to Nahan based on her refusal to remove her khimar constituted an adverse employment action. However, the EEOC has produced no evidence that Nahan actually had a referable position for Suliman or any other applicant on August 10, 2004. Upon Suliman's application, Corrieri merely discussed Suliman's potential eligibility to work at Nahan with her in the event that a position became available. Corrieri specifically testified that she did not recall whether there was an actual opening at Nahan on August 10, 2004, for which she could place Suliman, and the EEOC has produced no evidence that a position at Nahan was available that day. On these facts, we need not decide whether an employment agency's failure to refer a plaintiff for employment qualifies as an "adverse employment" action to resolve this case. The EEOC has failed to show that Nahan had an available position to which Kelly could actually refer Suliman when she applied for available temporary work through Kelly.

Even if we assume that the EEOC established a prima facie case of religious discrimination by Kelly, Kelly would still be entitled to summary judgment, as it provided a legitimate, non-discriminatory reason for its failure to refer Suliman to Nahan for employment, and EEOC failed to show that this reason was pretextual.

In a typical religious discrimination claim against an employer, once the plaintiff establishes a prima facie case, we require "the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action." *Ollis*, 495 F.3d at 575. We see no reason to vary from this burden-shifting scheme simply because the claim is against an employment agency instead of an employer. *Cf. Ostroff v. Employment Exchange, Inc.*, 683 F.2d 302, 304 (9th Cir. 1982) (explaining that, in a case involving plaintiff's claim of discrimination against an employment agency under § 2000e-2(b), once the plaintiff "established a prima facie case of differential treatment based on

-14-

sex, the burden fell upon defendants to articulate a legitimate, nondiscriminatory reason for their refusal to refer [the plaintiff]") (internal quotations and citation omitted).

Nevertheless, this inquiry is complicated by § 2000e(j)'s requirement that an "employer" accommodate a worker's religious beliefs unless doing so would create an undue hardship. 42 U.S.C. § 2000e(j) ("The term 'religious' includes all aspects of religious observance and practice, as well as belief, unless an *employer* demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the *employer's business*.") (emphasis added). But, in the present case, the EEOC sued Kelly in its capacity as an "employment agency," not an "employer," and nothing in § 2000e(j) suggests that an "employment agency," in defending itself against a claim of religious discrimination, must demonstrate that *the employer* to which it would be referring the temporary worker would suffer an undue hardship if it had to accommodate that worker.[8] Therefore, the only question before us is whether Kelly has provided a legitimate, nondiscriminatory reason for declining to refer Suliman to Nahan for employment.

---

[8]Even if the statute requires employment agencies themselves to "reasonably accommodate" a plaintiff in the referral process, we note that Kelly did so by offering Suliman at least seven alternative positions. *See, e.g.*, *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001) ("Accommodation can take place in two fundamental ways: (1) an employee can be accommodated in his or her current position by changing the working conditions, or (2) the employer can offer to let the employee transfer to another reasonably comparable position where conflicts are less likely to arise."); *Medina v. Adecco*, 561 F. Supp. 2d 162, 178–79 (D.P.R. 2008) (granting summary judgment to employment agency because no reasonable juror could conclude that employment agency engaged in pregnancy-based discrimination where the agency knew about the pregnancy and offered the plaintiff two job assignments after the employer to which the agency had referred her had terminated her).

-15-

Here, Kelly's legitimate, nondiscriminatory reason for not referring Suliman to Nahan was Nahan's facially neutral, safety-driven dress policy prohibiting all employees—permanent and temporary—from wearing loose clothing or headwear of any kind. Kelly's understanding that Nahan would not permit temporary workers to wear any type of headwear, including khimars, was well established. While Hentges and Jackie Olson gave conflicting testimony about whether they had spoken to one another specifically about Suliman wearing a khimar at Nahan, the evidence establishes that Nahan had previously informed Kelly that, due to safety concerns, no worker wearing a khimar would be permitted to work at Nahan. Olson testified that, when previously discussing the dress policy with Hentges, Hentges "had raised the question are khimars allowed, and we had indicated because of safety purposes . . . that we . . . wouldn't allow the employee to do that."

Moreover, assuming, as we must, that Hentges never called to discuss Suliman specifically with Olson, the record reflects that even if Kelly had asked whether Nahan could accommodate Suliman by allowing her to wear the khimar, the answer would have been "no." Olson testified that Nahan would not permit a woman wearing a khimar to tie her khimar back as an accommodation due to safety reasons. And, when asked how tying a khimar back is different from tying long hair back, Olson explained that "hair is permanent"; a khimar is different from hair because of the risk that the khimar—like a hat—could fall off in to the machinery. According to Olson, the safety risk would be the worker "[r]eaching in and trying to grab it, pulling an individual into a piece of equipment, damaging equipment, or other individuals that are trying to help could potentially be hurt as well."

And, the EEOC does not dispute that Nahan has a facially-neutral requirement—which was communicated to Kelly—that temporary workers should be able to perform *all* jobs. *See, e.g.*, *EEOC v. Oak-Rite Mfg. Corp.*, No. IP99-1962-C-H/G, 2001 WL 1168156, at *15 (S.D. Ind. Aug. 27, 2001) (unpublished) ("The record also contains evidence about Oak-Rite's policy and practice of requiring employees

-16-

to be able to work on any of the company's machinery. Requiring Oak-Rite to accommodate Enlow by assigning her only to those machines that could be operated most safely in a skirt also would impose an undue hardship on the administration of Oak-Rite's business. This is particularly true because Oak-Rite is a job shop with changing production needs.") (internal citations omitted).

Finally, there is no evidence in the record that Nahan's safety-driven dress policy was a pretext for discriminating against employees requiring religious accommodation or that Kelly had knowledge of such pretext.[9] Nothing in § 2000e-

[9]"[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business." *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975); *see also Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (upholding grant of summary judgment to employer where plaintiff alleged employer discriminated against him on the basis of his religion by requiring all employees whose duties involved potential exposure to toxic gases to shave any facial hair that prevented them from achieving gastight face seal when wearing a respirator because employer established that if "it retained [the plaintiff] as a machinist and directed his supervisors to assign [him] to only such duties as involved no exposure to toxic gas," the employer would be burdened by having to "revamp its currently unpredictable system of duty assignments to accommodate the need for predicting whether particular assignments involved potential exposure to toxic gases" and requiring the plaintiff's coworkers "to assume his share of potentially hazardous work"); *Oak-Rite*, 2001 WL 1168156, at *1 ("The accommodation that the EEOC suggests—'a reasonably close-fitting, denim or canvas dress/skirt that extends to within two or three inches above the ankle, when worn with leather above-the-ankle boots extending up under the dress/skirt'—would impose an undue hardship on Oak-Rite by requiring it to experiment with employee safety."); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745 (E.D.N.Y. 1998) (holding that transit authority's termination of Sikh subway car inspector for his refusal to comply with a requirement that subway car inspectors wear hard hats was not pretext for religious discrimination but instead reflected transit authority's nondiscriminatory, legitimate interest in protecting its employees from workplace hazards and that Sikh subway car inspector's proposal that transit company accommodate his religion-based refusal to wear hard hat by permitting him to perform

-17-

2(b) suggests that an employment agency should be held liable if the agency has no reason to believe that the "the employer's claim of bona fide occupations qualification is without substance." *Cf.* 29 C.F.R. § 1604.6(b) ("An employment agency that receives a job order containing an unlawful sex specification will share responsibility with the employer placing the job order if the agency fills the order knowing that the sex specification is not based upon a bona fide occupational qualification. However, an employment agency will not be deemed to be in violation of the law, regardless of the determination as to the employer, if the agency does not have reason to believe that the employer's claim of bona fide occupations qualification is without substance and the agency makes and maintains a written record available to the Commission of each such job order. Such record shall include the name of the employer, the description of the job and the basis for the employer's claim of bona fide occupational qualification.").[10]

Because the EEOC has failed to argue or produce any evidence that Kelly's legitimate, nondiscriminatory reason for not referring Suliman is pretextual, *see Ollis*, 495 F.3d at 575, we hold that the district court properly granted summary judgment to Kelly.

### III. *Conclusion*

Accordingly, the judgment of the district court is affirmed.

_____

_____

only work duties that did not require a hard hat would have imposed an undue hardship on transit authority because the costs would have been significant and other workers might have been placed at risk by inspector's refusal).

[10]The EEOC places a great deal of emphasis on Karls's testimony regarding his decision to move a Muslim woman wearing a full gown and a head covering from the end of the stitcher filling boxes to the cutter to stack paper on the day he filled in as a shift leader. While this testimony might be relevant in a lawsuit against *Nahan* regarding its ability to accommodate a worker under § 2000e(j), the testimony does not impact our analysis of whether *Kelly* has established a legitimate, nondiscriminatory reason for not referring Suliman to Nahan.