OPINION OF THE COURT
SLOVITER, Circuit Judge.
I.
The Equal Employment Opportunity Commission (“EEOC”) appeals from the decision of the District Court granting the summary judgment motion of defendant, the GEO Group, Inc. (“GEO”). GEO is a private company that was contracted to run the George W. Hill Correctional Facility (the “Hill Facility”), which is the prison for Delaware County, Pennsylvania. The EEOC filed its complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., on behalf of a class of Muslim women employees, alleging that GEO violated Title VII’s prohibitions on religious discrimination when it failed to accommodate the class members by providing them an exception to the prison’s dress policy that otherwise precluded them from wearing Muslim head coverings called khimars at work. GEO moved for summary judgment, arguing in part that a deviation from its policy would cause it an undue hardship by compromising its institutional interests in security and safety. Although the EEOC had filed a cross motion for summary judgment, on appeal it argues that the District Court erred because questions of material fact exist about whether accommodating the class would in fact constitute an undue hardship for GEO.
GEO is a private, international corporation that, among other related things, runs federal and state prisons in the United States. The Hill Facility in Thornton, Pennsylvania holds “pretrial detainees and persons serving a county sentence of two years less one day or a state sentence of five years less one day.” Appellant’s Brief at 3 (quotation omitted). During the relevant period Raymond Nardolillo was the warden at the Hill Facility and Matthew Holm, who was hired in August 2004, was the deputy warden. In about February 2008, Holm became warden of the Hill Facility.
In April 2005, the Hill Facility instituted a dress policy that provided that “[n]o hats or caps will be permitted to be worn in the facility unless issued with the uniform.” App. at 207. The new policy also stated that “[sjcarves and hooded jackets or sweatshirts will not be permitted past the Front Security Desk.” App. at 207. These directives were interpreted to prohibit the wearing of a khimar, an “Islamic religious head scarf, designed to cover the *268 hair, forehead, sides of the neck, shoulders, and chest,” [1] which was until then worn by some female Muslim employees inside of the Hill Facility. App. at 15.
To reinforce the April 2005 prohibitions on hats, head scarves and hoods, Holm issued a memorandum on October 24, 2005, entitled “UNIFORM POLICY,” that stated:
Reminder! All employees, while on duty, will if required, wear only an official GEO uniform, which adheres to the dress code and standards, described in Policy 300.19. This includes, but [is] not limited to the length of your hair, scarves, hooded jackets, sweatshirts and specifically hats. The following are excerpts form [sic] the policy:
“No hats or caps will be permitted to be worn in the facility unless issued with the uniform.”
“The Uniform described below is not to be altered, modified, or embellished upon. Only items approved by the Warden will be authorized.”
Those employees not subjected to the uniform policy will adhere to the Facility dress code, which is posted at the Front Entrance Security Post/ION Scan.
This means that all hats, caps or religious attire will not be permitted to be worn with your uniform or by non-uniformed employees unless specifically authorized by the Warden. At this time there are no authorized hats, caps or attire, which can be worn inside the jail and there are no exceptions to this policy.
App. at 215.
After the October 2005 memorandum was issued, Holm and Nardolillo adopted and enforced a “zero tolerance headgear policy----” Appellant’s Br. at 6. According to GEO, the no-headgear policy was adopted for safety and security reasons to prevent the introduction of contraband into the prison facility and to avoid misidentification.
Three Muslim women employees of the Hill Facility, Carmen Sharpe-Alien, Marquita King, and Rashemma Moss, protested, claiming that wearing of the khimar was required by the Islamic religion. They sought an exception to the policy, arguing that before the April 2005 dress code, they had all been wearing some style of khimar or head covering at work. After the April 2005 dress code was instituted, they were all prevented from doing so.
Sharpe-Alien was hired as a medication nurse at the Hill Facility in 2004. During her interview for that position she explained that her faith required her to wear a khimar, and that she “wasn’t willing to compromise” concerning the wearing of her khimar at work. App. at 43. According to Sharpe-Alien, the interviewer told her that “[h]e didn’t see it being a problem.” App. at 44. Part of Sharpe-Allen’s initial job at the Hill Facility was to “go from cell block to cell block” to “dispense medication” accompanied by a prison “officer.” App. at 45.
In early 2005, Sharpe-Alien became the chronic infectious disease nurse, a position in which she worked “closely with the doctor” in the infirmary “with the inmates who had infectious diseases, such as hepatitis, [and] HIV ... [to] ma[k]e sure that they got their medication, [and] made sure it was ordered.... [and in which she] did all of the PPDs, which is the tuberculosis test, for the entire prison.” App. at 49. *269 “From November 2004 through mid-July 2005, when Sharpe-Alien went out on medical leave, she wore her khimar to work daily at” the Hill Facility. Appellant’s Br. at 8. When Sharpe-Alien was preparing to return to work from that medical leave, colleagues called to tell her that she could not “wear [her] khimar when [she] c[a]me back to work.” App. at 52. Sharpe-Alien then spoke with someone in human resources at the Hill Facility who told her that “the khimar would be an issue.” App. at 54. As a result, Sharpe-Alien asked to speak with Warden Nardolillo.
According to Sharpe-Alien, when she and Nardolillo spoke,[2] the warden told her that the policy would be enforced against her but asked if she would be willing to “wear a headpiece [or] hairpiece.... ” App. at 58. He also told Sharpe-Alien that her “job was there, if [she] wanted it, [she] just couldn’t wear [her] khimar,” but that if she refused to work without the khimar or resign, the prison would have to fire her. App. at 59. Sharpe-Alien told Nardolillo that she enjoyed her job and that the khimar had never presented any problem in the past, but also that she would not compromise about wearing the khimar to work. In December 2005, Allen was fired on the ground that “she had ‘effectively abandoned her job’ by Tefus[ing] to comply with [the] directive to return to work without the wearing of her’ ” khimar. Appellant’s Br. at 10 (quoting App. at 216-17).
Marquita King is a Muslim woman who was hired at the Hill Facility in July 2000 as an “intake specialist” at the prison: the person who does the paperwork to process new prisoners into the facility. King’s job entailed such duties as performing a “beneh warrant check” on new prisoners. App. at 129. She would also have corrections officers bring individual prisoners to her so that she could ask them questions and input their answers into a computer. Unlike the corrections officers, she had no keys to the facility. At her interview for the job, King wore her khimar and a veil. The interviewer asked King if she would take her veil off at work, and King agreed that would be acceptable. There was no discussion of King’s khimar at the interview, and she wore it to work for the first five years of her employment.
In October 2005, King was told by a fellow employee that she and other Muslim women were no longer allowed to wear their khimars at work. King then called Warden Nardolillo who, according to King, told her that she “will be fired if [she] ha[s] a khimar on [her] head” at work. App. at 131. Stressed by this new situation, King took leave for the next four to six weeks. When she returned, King took off her khimar at work.
Rashemma Moss began working as a correctional officer at the Hill Facility in March 2002, a job which sometimes required her to be close to inmates and sometimes even to come into physical contact with them. In July 2005, after Moss took her Shahada — “the Muslim confession of faith,” Appellant’s Br. at 6 n.2 — at work she began to wear underneath her hat a triangle shaped underscarf that she would tie around her head. In a meeting in October 2005, Nardolillo told Moss that she could no longer wear her head scarf, and that she would be suspended without pay if she did. Thereafter, Moss stopped wearing her head scarf to work.
*270 In September 2007, the EEOC as plaintiff, with Sharpe-Alien as the charging party, filed a complaint alleging that GEO violated Title VII’s prohibitions on religions discrimination when GEO failed to accommodate the religious beliefs of Sharpe-Alien and other female Muslim GEO employees by refusing their requests for an exception to the Hill Facility’s dress policy that would have allowed them to wear khimars at work.
GEO moved for summary judgment, in part asserting the affirmative defense that it would be an undue hardship as a matter of law for the prison to allow its Muslim employees a complete exception to the non-headgear policy because such an accommodation would compromise the prison’s interest in safety and security and/or would result in more than de minimis cost. The EEOC opposed that motion on the ground that these interests were insufficiently founded, relying heavily on the report of its expert, George Camp (the “Camp Report”), which generally concluded that: “(1) GEO’s professed reasons for denying any of its female employees the ability to wear a khimar lack merit and substance; (2) GEO made no genuine attempt to, nor reasonable offer of, an alternative method (of which several exist) for accommodating the wearing of the khimar; and (3) [tjhere is no sound legitimate correctional reason for GEO to deny its female employees to wear a khimar within the secure perimeter of the facility.” App. at 219.
The District Court granted GEO’s motion, finding dispositive this court’s reasoning in Webb v. City of Phila., 562 F.3d 256, 258 (3d Cir.2009). In Webb this court held that the dress code adopted by the Philadelphia police, which did not “authorize[ ] the wearing of religious symbols or garb as part of the uniform” and therefore precluded Muslim women from wearing khimars on the job, was not a violation of Title VII. Id. In granting GEO’s motion for summary judgment, the District Court concluded that there was “no meaningful distinction between prison guards and similar personnel, on the one hand, and police officers,” who were at issue in Webb. EEOC v. GEO Group, Inc., No. 07-cv-04043-JF, 2009 WL 1382914, at *1 (E.D.Pa. May 18, 2009). The Court also stated that the “same considerations advanced to justify the regulation in question apply equally to prison guards and employees working in the medical department.” Id.

II.

Our review of the District Court’s grant of summary judgment is plenary. Jackson v. Danberg, 594 F.3d 210, 215 (3d Cir.2010). Summary judgment “should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c).[3]
Title VII of the Civil Rights Act of 1964 reads, in relevant part:
(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s ... religion ...; or
*271 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s ... religion....
42 U.S.C. § 2000e-2(a). “Religion” is defined to include “all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee’s ... religious observance or practice without undue hardship on the conduct of the employer’s business.” Id. § 2000e(j).
This court has recently stated: “To establish a prima facie case of religious discrimination, the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (8) she was disciplined for failing to comply with the conflicting requirement.” Webb, 562 F.3d at 259. “[T]he burden [then] shifts to the employer to show either [1] it made a good-faith effort to reasonably accommodate the religious belief, or [2] such an accommodation would work an undue hardship upon the employer and its business.” Id. (citation omitted).
GEO does not argue that the EEOC failed to present a prima facie case. Instead, GEO argues that it offered plaintiffs “a reasonable accommodation, by offering to permit the Muslim women employees to wear a hairpiece in place of the khimar” because “it fulfills the stated religious requirement that the hair be covered.” Appellee’s Br. at 13-14; see Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986) (noting that there is “no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation.”). GEO notes that one female Muslim employee found that a hairpiece was sufficient to fulfill the religious requirement to cover her hair. We are not persuaded by this argument. There is no evidence about the proposed hairpiece nor any details about the Muslim employee who found it acceptable. We are unwilling to delve into any matters of theology, and will therefore decline GEO’s invitation to decide on our own what might constitute a reasonable substitute for a khimar under the Islamic faith. GEO does not challenge the assertion of the three Muslim employees that they believe wearing the khimar is integral to their religion, and we proceed on the basis that this is their sincere religious belief.
In response to the EEOC’s motion for summary judgment, which relied primarily on the Camp Report and the deposition testimony of the three female employees, GEO proffered the testimony of the two GEO wardens. Warden Holm testified that before he became deputy warden at the Hill Facility, he had previously worked as the lead investigator for GEO at the Taft Correctional Institution in Taft, California. In that position, he was responsible for “initial criminal investigation on new crimes committed by inmates, all serious crimes committed by inmates.” App. at 169. His “personal focus” was on “internal affairs, violations of the rules by staff.” App. at 169. He investigated GEO staff for, among other things, having introduced contraband to prisons, and for “actually selling and distributing controlled substances to inmates.” App. at 169. Holm was also the lead investigator of “a fairly large disturbance at the Taft Correctional Facility that involved approximately 900 to 1,000 inmates,” an incident that he described as “more or less a riot.... ” App. at 169. According to Holm, that investigation involved “issues about identification of inmate and video surveillance.” *272 App. at 169. Before working with the GEO Group, Holm was a California police officer for 18 years.
In the year after Holm was hired at the Hill Facility, he and Nardolillo made numerous changes to the prison’s policies to address what they perceived as the prison’s “need[ ] to ... improve the performance of the facility and the staff and to enhance security and tighten a few things up.” App. at 171. One thing that Holm had noticed was that despite a long-standing, apparently unspoken ban on prison employees wearing unauthorized hats, that ban was not well-enforced. Although the only hats that were authorized were a black baseball hat with the GEO logo on and a knit cap that could be used outdoors, Holm had observed employees wearing unauthorized hats with “different logos, different things that weren’t appropriate to the uniform of the GEO Group,” App. at 184, and wearing hats “backwards and sideways,” App. at 183. During his deposition, Holm also recalled one incident of an employee wearing a “New York Yankees baseball hat inside the institution while in full uniform.” App. at 183.
This concerned Holm in part because of his view that “the band inside of a baseball cap is an excellent place to hide small amount[s] of narcotics and small amounts of contraband. A wire, a small knife, anything can go in there.” App. at 183. “[A]nother issue” he had with employees wearing hats was “based on [his] personal experience”: the “identification of an individual wearing a hat when they would be inside [the] secure portion [of the prison] ... where we rely heavily on video surveillance ... [because a hat] distorts the identity of the individual wearing the cap, which to me is an overall safety and security issue for the prison because it would be entirely possible for an inmate to get a uniform shirt, put a hat on, pull it real close ... [so that] it distorts the view of their face and you can’t tell who they are when they walk out.” App. at 183.
Holm’s experience was that “during the riot in Taft Correctional Facility based on the review of video surveillance, which is what [GEO] based most of [its] investigation on.... there were probably better than 300 or 400 inmates that [GEO] couldn’t identify ... simply because they had a baseball cap on.” App. at 184. Moreover, one “inmate put a hat on ... change[d] [his] shirt ... pulled [a] hat over his face and walked out the front door.” App. at 203. As a result, Holm approached Nardolillo to crack down on employees wearing unauthorized hats and other “headgear.”
When asked for additional reasons for why this no-khimar policy was adopted, Holm opined that a head scarf could be “taken away from an individual and used against them, in any form of a choking movement.... [i]t could be used as a restraint device ... [and it] provides unwanted material for inmates to grab ahold of and/or use against [the] staff.” App. at 201. Asked to distinguish the safety difference presented by a “head covering” and that presented by “someone’s shirt or someone’s pants,” Holm answered that a khimar, if “grabbed from the behind by the sides of it, ... immediately becomes a choking instrument,” App. at 201, as would a man’s tie, an item of clothing also generally forbidden for anyone who “has direct contact with inmates on a daily basis....,” App. at 202. Holm also noted that because a “khimar [has] [a] band right across the forehead and ... it has the two pieces of material that come down the side of [the] face, anything that casts a shadow on the face, be it from above or the side ... it casts a shadow,” making identification difficult. App. at 202.
*273 Warden Nardolillo also explained that the justification for the new zero-tolerance headgear policy was instituted because “[w]e have had some security issues that were becoming extremely problematic. One primarily being the increased introduction of contraband, specifically drugs, into the institution.” App. at 75.
The EEOC characterizes Holm’s testimony as “utterly speculative and conclusory.” EEOC Br. at 39. However, Holm had significant prior experience in prison administration, and that practical experience adds weight to the concerns that he expressed as the basis for the no-headgear policy. We must therefore decide whether GEO made the necessary showing of the undue hardship defense.
An “undue hardship” is one that results in more than a de minimis cost to the employer. Webb, 562 F.3d at 260 (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)). “Both economic and non-economic costs can pose an undue hardship upon employers.... ” Id. (citations omitted). In deciding whether undue hardship exists, “[w]e focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship.” Id. (citing Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 134 (3d Cir.1986)). In Webb, we stated that the Supreme Court’s decision in Trans World Airlines, 432 U.S. at 84, 97 S.Ct. 2264, “strongly suggests that the undue hardship test is not a difficult threshold to pass.” Webb, 562 F.3d at 260. A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer-prison. As noted above, the specific safety and security risks that GEO asserts regarding the wearing of head coverings in prison are the “smuggling of contraband, misidentification and the use of [a] khimar as a strangulation weapon in a conflict with an inmate.” Appellee’s Br. at 17.
We agree with the EEOC that the Webb court did not purport to establish a per se rule of law about religious head coverings or safety “that would govern in all religious discrimination cases, all ‘paramilitary organization’ cases, or even all police department cases.” Appellant’s Br. at 31-32. GEO does not disagree. Nonetheless, Webb is relevant to this case by analogy, as some security and uniformity interests held by the police force are also implicated in the prison context.
In its brief to this court, GEO also supports its no headgear policy “due to its effect on [its] legitimate interest [ ] in requiring uniformity of appearance among prison employees to promote an environment of discipline and an esprit de corps.” Appellee’s Br. at 19. It notes that this interest was cited in Webb where we stated “that uniform requirements are crucial to the safety of officers (so that the public will be able to identify officers as genuine, based on their uniform appearance), morale and esprit de corps, and public confidence in the police.” 562 F.3d at 262 (citing Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 366 (3d Cir.1999)). The EEOC points out that unlike the City of Philadelphia in Webb, GEO’s witnesses did not refer to the uniformity of appearance as justification for GEO’s dress code policy at the summary judgment stage, suggesting that this was an afterthought that arose only after the Webb opinion was filed. In fact, both wardens did testify about their concern regarding the employees’ lack of uniform appearance, see App. at 77-81 (Nardolillo) *274 and App. at 183 (Holm).[4] Even the EEOC’s expert Camp concurred “that uniformed employees should wear only agency issued visible items.” App. at 226. It is unnecessary for us to decide whether this interest alone would support summary judgment, as we decide the case on different grounds.
GEO also argues that the costs that it would incur were it to adopt the accommodation requested by the Muslim employees of allowing them to wear khimars would “cause an undue burden with respect to prison resources.” Appellee’s Br. at 18. According to GEO, this is because “Muslim female employees can move freely throughout [the prison]” and “[w]hen doing so ... must pass through numerous checkpoints to pass between secured portions of the facility” including “approximately [sixteen] different entry/exit doors that are monitored by closed-circuit video cameras at which visual identification/recognition is required prior to the door being electronically opened.” Appellee’s Br. at 18. Although GEO has not entirely convinced us that adopting the proposed accommodations of allowing female Muslim employees to wear khimars but removing them at each checkpoint would require locking down the prisoners in each such location, we recognize that adopting the proposed procedure would necessarily require some additional time and resources of prison officials.
In the last analysis, GEO’s no headgear policy must stand on the testimony of Holm and Nardolillo that (1) khimars, like hats, could be used to smuggle contraband into and around the Hill Facility, (2) that khimars can be used to conceal the identity of the wearer, which creates problems of misidentification, and (3) that khimars could be used against a prison employee in an attack. To be sure, GEO acknowledges that “there were no reports of these types of incidents at [the Hill Facility] during Warden Nardolillo’s and Warden Holm’s tenure[s] at the facility,” but we agree with GEO that a prison “should not have to wait for a khimar to actually be used in an unsafe or risky manner, risking harm to employees or inmates, before this foreseeable risk is considered in determining undue hardship.” Appellee’s Br. at 17. In other words, because “[i]n a prison setting, the safety of the employees and inmates is of top priority.... [GEO] should not be prevented] from countering, through appropriate policies, the risks which might be posed by the plaintiff[s’] preferred accommodation.” Appellee’s Br. at 17.
Even assuming khimars present only a small threat of the asserted dangers, they do present a threat which is something that GEO is entitled to attempt to prevent. To GEO, the fact that inmates have other clothes that could also be used to strangle a guard “does not mean that the facility would be out of line in banning something else which can also be used as such a weapon,” especially given that a khimar does not have a legitimate penological jus *275 tification. Appellee’s Br. at 36. It argues that unlike other clothing, “the khimar is already located about the guard’s head, virtually around the neck already.” Appellee’s Br. at 36.
The arguments presented by the parties make this a close case. The EEOC has an enviable history of taking steps to enforce the prohibition against religious discrimination in many forms and its sincerity in support of its arguments against the application of the no headgear policy to Muslim employees wearing khimars is evident. On the other hand, the prison has an overriding responsibility to ensure the safety of its prisoners, its staff, and the visitors. A prison is not a summer camp and prison officials have the unenviable task of preserving order in difficult circumstances.
In Bell v. Wolfish, the Supreme Court, albeit faced with different prison regulations that were challenged under the Fourth Amendment, noted that “[t]he Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained.” 441 U.S. 520, 540, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Court also noted that prisons are “unique plaee[s] fraught with serious security dangers” and therefore the effective management of a detention facility is a valid objective that may justify imposition of various conditions. Id. at 559, 99 S.Ct. 1861. In that case, the Court cautioned the federal courts to make only limited inquiry into prison management because “[t]he wide range of ‘judgment calls’ that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.” Id. at 562, 99 S.Ct. 1861. Although we do not take those remarks to deter federal courts from upholding the constitutional rights of prisoners and prison staff alike, they must be considered in making the kind of delicate balance called for in this case.
This court’s recent opinion in Webb held that notwithstanding the sincere religious beliefs of the plaintiff police officer of the need to wear a khimar, that belief was subordinate to the police department’s policy prohibiting the wearing of a khimar because “ ‘safety is undoubtedly an interest of the greatest importance.’ ” Webb, 562 F.3d at 262 (quoting Fraternal Order of Police, 170 F.3d at 366). The District Court did not err by relying on Webb in granting summary judgment to GEO. We reach the same result in balancing the respective considerations here.
We respond to the comments of our dissenting colleague. Judge Tashima takes issue with our acceptance of GEO’s explanation that its no-headgear policy was based on its interest in safety, i.e., prevention of the introduction of contraband, and the undue hardship that the proffered accommodations would entail. He has a lengthy discussion impugning the reasons given by Warden Nardolillo and Deputy Warden (later Warden) Holm for the 2005 change in policy. We find that criticism unfairly cynical.
Deputy Holm had transferred to the Hill Facility in 2004, after working for another GEO facility for six years. App. at 170. In that capacity he focused on internal affairs, violations of the rules by the staff, including, inter alia, introduction of contraband. App. at 169. He had previously been a state police officer for eighteen years. App. at 170. Thus, it should not be considered surprising that after he was transferred to the Hill Facility he reviewed the security procedures. His testimony persuasively refutes any suggestion by the Dissent that Nardolillo and Holm were not actually concerned about the introduction of contraband. Holm testified that the issue of contraband was the sub *276 ject of discussion with Nardolillo “probably close to 100” times. App. at 173. Certainly a prison facility should not be faulted for making changes that strengthened its security policies when reviewed by a new set of eyes.
The Dissent downplays GEO’s claim that the accommodations suggested by the EEOC would cause undue hardship. The khimar-switching proposals, either switching khimars or removing them at checkpoints, are facially implausible and time consuming. They would need to be removed, folded, and stored in a locker not yet available. It is worth noting that there are elaborate precautions taken when visitors to the prison wear khimars. A female officer escorts the visitor to the ladies’ room where the khimar is removed, the visitor is photographed, and the khimar replaced. This process entails considerable time and effort for the staff, but the authorities deem it necessary to protect against contraband. App. at 102-03, 286.
The Dissent apparently believes it is unlikely that a khimar may be used to strangle the wearer. The Dissent posits the possibility that a khimar could be worn as a bandana is worn. See Dissent at 284 n.l. The EEOC never introduced a khimar into evidence. Although khimars may come in different shapes and sizes we note the description adopted by a sister circuit that stated “[a] khimar is a traditional garment worn by Muslim women that covers the forehead, sides of the head, neck shoulders, chest and sometimes their waist,” EEOC v. Kelly Servs., 598 F.3d 1022, 1023 n. 1 (8th Cir.2010) (quotation and citation omitted), a description similar to that provided in the EEOC’s complaint. If that were the size of the garment worn by a staff member, the possibility of strangulation should not be taken lightly. Nor does the Dissent explain how allowing Muslim women to wear bandana-like khimars would entirely alleviate the safety concern as a bandana, too, could be used as a weapon. A blanket policy to prohibit all headgear except those issued with the prison uniform seems the sensible solution.
Judge Tashima notes that kitchen employees who frequently interact with prisoners continue to wear hats within the secure facility. Had the EEOC raised that issue in the District Court, GEO undoubtedly would have pointed to Nardolillo’s deposition testimony that there were specific safety measures applicable to kitchen workers. App. at 79-80. In fact, the Pennsylvania Administrative Code provides:
General requirement. Employees shall wear hair restraints such as hats, hair coverings or nets, beard restraints and clothing that covers body hair, that are effectively designed and worn to keep their hair from contacting exposed food; clean equipment, utensils and linens; and unwrapped single-service and single-use articles.
7 Pa.Code § 46.152(a). Anyone who has visited a prison will observe many prisoners with long, sometimes unruly, hair, a sanitary concern addressed by the general state requirement that kitchen workers who handle food wear hats. Moreover, the kitchen workers at the Hill Facility were not permitted to wear the hats outside of the kitchen. App. at 80. The Dissent’s reference to kitchen hats is just another red herring.
The Dissent appears to place more reliance on the testimony of the EEOC’s expert witness than on the testimony of the experienced prison officials on the site at issue. The Dissent’s view of how a prison should be run, particularly its minimization of the security concerns that motivated the change in headgear policy at the Hill Facility, runs counter to the direction we *277 have been given by the Supreme Court which stated:
Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.
Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).
As the en banc Ninth Circuit recently stated, its obligation is “to comply with the Supreme Court’s direction that we not substitute our judgment for that of corrections facility officials.” Bull v. City and Cnty. of San Francisco, 595 F.3d 964, 978 (9th Cir.2010) (citation omitted).
III.
Accordingly, we will affirm the District Court’s order granting summary judgment to GEO.

. Although there appear to be many different styles of khimars, neither party has attempted to describe the khimars at issue here with any particularity. The quoted definition is from the complaint, and we will accept it as an accurate description that applies to the khimars worn by the class members.

. Sharpe-Alien testified that she had two meetings with the warden, but she could not remember exactly what transpired at either of them. According to Sharpe-Allen’s testimony, Nardolillo took the consistent position at both meetings that she would not receive an exception to the no khimar rule.

. The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

. In Webb, there was uncontradicted evidence that the Philadelphia Police Department had a "vital” interest in maintaining its "uniform as a symbol of neutral government authority, free from expressions of personal religion, bent or bias.” Webb, 562 F.3d at 261. Although neither warden in this case tied the uniformity of appearance requirement to safety concerns, we cannot completely reject their concern about staff wearing unauthorized hats and the need for staff adherence to the dress code in order for the employees to present the appearance of a disciplined prison staff. See, e.g., App. at 78, 84 (Nardolillo); App. at 183, 185 (Holm). Similarly, the concern referred to in Webb about the need for police to present an appearance of religious neutrality is also applicable to prison staff, as we can take judicial notice of the prevalence of different religious groups within a prison.