**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1900
_____

GERALD E. GROFF,
Appellant

v.

LOUIS DEJOY, Postmaster General United States Postal
Service
_____

Appeal from United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-19-cv-01879)
U.S. District Judge: Honorable Jeffrey L. Schmehl
_____

Argued January 25, 2022
_____

Before: HARDIMAN, SHWARTZ, and FUENTES, <u>Circuit
Judges</u>.

(Filed: May 25, 2022)

Christopher Tutunjian [ARGUED]
Aaron M. Streett
Baker Botts L.L.P.
910 Louisiana Street
One Shell Plaza, 37th Floor
Houston, TX 77002

David W. Crossett
Cornerstone Law Firm, LLC
8500 Allentown Pike
Suite 3
Blandon, PA 19510

David J. Hacker
Hiram S. Sasser, III
Stephanie N. Taub
First Liberty Institute
2001 West Plano Parkway
Suite 1600
Plano, TX 75075

Alan J. Reinach
Church State Council
2686 Townsgate Road
Westlake Village, CA 91361

Jeremy L. Samek
Randall L. Wenger
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
                    Counsel for Appellant

Veronica J. Finkelstein [ARGUED]
Lauren E. DeBruicker
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
                    Counsel for Appellee

_____

OPINION OF THE COURT

_____

SHWARTZ, Circuit Judge.

Plaintiff Gerald Groff is a Sunday Sabbath observer whose religious beliefs dictate that Sunday is meant for worship and rest. As a result, Groff informed his employer, the United States Postal Service ("USPS"), that he was unable to work on Sundays. USPS offered to find employees to swap shifts with him, but on more than twenty Sundays, no co-worker would swap, and Groff did not work. Groff was disciplined and ultimately left USPS.

Groff sued USPS[1] for violating Title VII by failing to reasonably accommodate his religion. Because the shift swaps USPS offered to Groff did not eliminate the conflict between his religious practice and his work obligations, USPS did not provide Groff a reasonable accommodation. The accommodation Groff sought (exemption from Sunday work), however, would cause an undue hardship on USPS, and so we

_____

[1] Postmaster General Louis DeJoy is the named defendant, but we refer to Defendant as USPS for simplicity.

will affirm the District Court's order granting summary judgment in USPS's favor.

I

A

USPS employs several types of postal carriers. One type is a Rural Carrier Associate ("RCA"). An RCA is a non-career employee who provides coverage for absent career employees. RCAs work "as needed," so the job requires flexibility. JA456. RCAs do not accrue leave, and any leave they take is unpaid. USPS also employs Assistant Rural Carriers ("ARCs") who are hired to work only on Sundays and holidays. At the time of Groff's employment, there was a shortage of RCAs in his region.

Groff joined USPS in 2012. He became an RCA that year. In March 2014, Groff transferred to the Quarryville Post Office, where he worked until he transferred to the Holtwood Post Office in August 2016. Groff remained at Holtwood until he resigned from USPS in January 2019.

B

In 2013, USPS contracted with Amazon to deliver Amazon packages, including on Sundays. Amazon delivery initially began at only some post offices and the scheduling of

4

RCAs was left to each postmaster's discretion.[2]  The success of Amazon Sunday delivery was critical to USPS.

In May 2016, USPS and the National Rural Letter Carriers' Association ("Union") entered a Memorandum of Understanding ("MOU") concerning Sunday and holiday parcel delivery.[3]  The MOU created two scheduling arrangements.  During the peak season (mid-November through early January), each post office was responsible for scheduling its own carriers and delivering its packages on Sundays and holidays.  During the non-peak season (late January through mid-November), individual post offices became part of a regional hub, from which all Sunday and holiday mail was delivered.  The Quarryville and Holtwood Post Offices are part of the Lancaster Annex hub.

To staff the hub during the non-peak season, USPS generated a list of part-time flexible rural carriers, substitute rural carriers, RCAs, and rural relief carriers employed at post offices within the geographic area serviced by the Lancaster Annex hub.  USPS asked these employees whether they wanted to work on Sundays and holidays.  Based on their responses, USPS created two lists: volunteers and non-

---

[2] The Holtwood Post Office was a "non-promised site" under the Amazon contract, which meant that it was not contractually bound to deliver parcels on Sunday, but the volume of packages made Sunday Amazon delivery at Holtwood a necessity.

[3] RCAs were also obligated to work on Sundays as needed under the Union's contract.

volunteers.[4] Each list was alphabetized by last name, without regard to seniority, classification, or assigned office. For Sundays and holidays, management first scheduled any ARCs assigned to the hub. If this was insufficient for coverage, management then scheduled from the volunteer list on a rotating basis. If more coverage was needed, management would then schedule from the non-volunteer list on a rotating basis. All scheduled carriers then reported to the Lancaster Annex for the Sunday or holiday delivery.[5] The MOU contained two exemptions for Sunday or holiday work. USPS could skip an individual (1) who had approved leave adjacent to a Sunday or holiday, or (2) whose workweek would exceed forty hours if assigned to work on the Sunday or holiday.[6]

Quarryville began delivering Amazon packages on Sundays in 2015. Quarryville was a relatively large station and had sufficient carriers available for Sunday delivery. Before the MOU went into effect, the Quarryville Postmaster exempted Groff from Sunday work so long as he provided coverage for other shifts throughout the week. After the MOU went into effect, the Postmaster informed Groff that he would

_____

[4] Of the forty employees as of July 2, 2017, thirty-seven were on the non-volunteer list and three were on the volunteer list.

[5] While RCAs had no contractual right to specific days off, they received overtime pay for working Sundays and holidays.

[6] Additionally, RCAs covering vacant regular routes or regular routes during the absence of a regular carrier would not be scheduled unless both the volunteer and non-volunteer lists were exhausted.

6

have to work Sundays during the peak season or find another job.

To avoid Amazon Sunday deliveries, Groff transferred to Holtwood, a small station with a postmaster, three full-time carriers, and three RCAs (including Groff). In March 2017, however, Holtwood began Amazon Sunday deliveries.

Groff informed the Holtwood Postmaster that he would not be reporting to work on Sundays due to his religious beliefs. In response, the Holtwood Postmaster offered Groff several options. The Holtwood Postmaster offered to adjust Groff's schedule to permit him to attend religious services on Sunday morning and report to work afterward, which was an accommodation provided to other employees. Later, the Holtwood Postmaster sought out others to cover Groff's Sunday shifts, which he said was the only accommodations that would not "impact operations." JA599. During the 2017 peak season, another RCA agreed to cover Groff's Sunday shifts, but she was later unable to do so due to an injury. As a result, the remaining RCA and the Holtwood Postmaster worked all Sunday shifts. Groff acknowledged that his fellow RCA had to bear the burden of Amazon Sundays alone during the 2017 peak season.

Because Groff did not work when scheduled on Sundays, he faced progressive discipline. During the disciplinary process, USPS proposed another alternative: pick a different day of the week to observe the Sabbath.

Groff contacted an Equal Employment Opportunity ("EEO") counselor at USPS to pursue pre-complaint counseling, during which he requested a total exemption from

7

Sunday work. Thereafter, Groff filed a complaint with the EEO office. USPS determined that Groff established a prima facie claim for failure to accommodate, but that USPS did not engage in discrimination.

Thereafter, Groff requested a lateral transfer to a position that did not require Sunday work. All available positions typically required Sunday work, however, so his request was rejected. To accommodate Groff during the 2018 peak season, the Holtwood Postmaster again attempted to find coverage for each Sunday that Groff was scheduled to work. The Holtwood Postmaster described finding coverage for Groff as "not always easy, . . . time consuming, and [that] it added to [his] workload and those of other postmasters." JA452.

In addition to the resources expended to find coverage, Groff's absence had other consequences. The Holtwood Postmaster himself was forced to deliver mail on Sundays when no RCAs were available because putting off delivery until Monday would have impacted efficiency and safety the following day.[7] Moreover, Groff's refusal to report on Sundays created a "tense atmosphere" among the other RCAs, as they had to work more Sundays to cover Groff's absences, JA 464, and resentment toward management.

Groff's absence also had an impact at the hub during the non-peak season. For example, other carriers were called to

---

[7] The Holtwood Postmaster also testified that USPS had to pay overtime to ensure Sunday coverage, though the USPS corporate representative had no knowledge of overtime payments.

work at the hub more frequently, which resulted in other employees "do[ing] more than their share of burdensome work." JA218. One supervisor at the hub testified that this contributed to morale problems amongst the RCAs. In addition, USPS scheduled an extra person to work at the Lancaster Annex each Sunday on which Groff was scheduled in anticipation that he would not show up. However, in July 2018, management was directed not "to overschedule non volunteers to accommodate" Groff.[8] JA684. Groff's absence also required the other carriers to deliver more mail than they otherwise would have on Sundays. JA492.

Groff received additional discipline and submitted two more EEO complaints, in which he again sought an accommodation not to work on Sundays or a transfer to a position that did not require Sunday work.

Groff resigned in January 2019. In his resignation letter, he stated that he decided to leave his job because he was unable to find an "accommodating employment atmosphere

_____

[8] In addition, a union member submitted a grievance in summer 2017, alleging that the MOU was violated because he was being "forc[ed]" to work on Sundays while others were not being required to work. JA 501. The grievant specifically identified Lancaster management's scheduling practices around Groff. USPS expended time and resources engaging in the grievance process with the Union, including appeal and settlement. As part of that settlement, the Union and USPS agreed that (1) any accommodation "cannot infringe upon or deprive another employee their contractual rights or benefits under the bargaining unit agreement" and (2) Sunday/holiday delivery schedules must be consistent with the MOU. JA516.

9

with the USPS that would honor [his] personal religious beliefs" and would instead pursue "more rewarding work/service interests." JA388.

After Groff's employment ended, USPS issued a final agency decision as to Groff's complaints challenging the discipline and USPS's alleged failure to accommodate. USPS found no discrimination. Groff did not appeal to the Equal Employment Opportunity Commissions ("EEOC").

C

Groff sued USPS, alleging two causes of action for religious discrimination under Title VII of the Civil Rights Act of 1964: (1) disparate treatment, and (2) failure to accommodate. After discovery, the parties filed cross-motions for summary judgment. The District Court granted USPS summary judgment on both claims. Groff v. DeJoy, No. 19-1879, 2021 WL 1264030, at *5 (E.D. Pa. Apr. 6, 2021).[9]

The District Court stated that our Court never squarely held that an accommodation needs to wholly eliminate the conflict between a work requirement and a religious practice to be reasonable. Id. at *10. Relying on opinions from other circuits and from district courts within our Circuit, the Court held that "an employer does not need to wholly eliminate a conflict in order to offer an employee a reasonable accommodation." Id. The Court noted that Groff was offered the chance to swap shifts with other employees and concluded USPS offered Groff a reasonable accommodation, even if he

---

[9] Groff does not appeal the District Court's order granting summary judgment on his disparate treatment claim.

10

was "not happy" with it, because voluntary shift swapping could be a reasonable accommodation. Id.

The District Court also: (1) found that USPS provided evidence of "multiple instances" of undue hardship, including that providing Groff an exemption from Sunday work would violate the MOU; (2) disagreed with Groff that Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977), was limited to violations of a collective bargaining agreement's seniority provisions; (3) explained that interpreting "approved leave" in the MOU to include permanent religious leave would "strain[] credulity"; and (4) found that granting Groff's requested exemption was an undue hardship because, among other things, it required the only other RCA to work "every single Sunday without a break." Groff, 2021 WL 1264030, at *11-12.

Groff appeals.

II[10]

A

Title VII of the Civil Rights Act of 1964 makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Congress "illuminate[d] the meaning [of] religious discrimination" in its definition of religion under Title VII. EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir. 2008) (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 n.1 (1986)). Under Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on

---

[10] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's order granting summary judgment is plenary, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

12

the conduct of the employer's business." 42 U.S.C. § 2000e(j).[11]

To establish a prima facie case of religious discrimination under Title VII, an employee must show that he: (1) holds a sincere religious belief that conflicts with a job requirement; (2) informed his employer of the conflict; and (3) was disciplined for failing to comply with the conflicting job requirement. EEOC v. GEO Grp., Inc., 616 F.3d 265, 271 (3d Cir. 2010). The parties do not dispute that Groff established a prima facie case for purposes of summary judgment because he: (1) has a sincere religious belief that prohibits work on Sunday, and this conflicts with USPS's Sunday schedule; (2) informed USPS of this conflict; and (3) was disciplined after he failed to appear for his scheduled Sunday shifts.

Once a plaintiff establishes a prima facie case, "the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business." Webb v. City of Phila., 562 F.3d 256, 259 (3d Cir. 2009). Thus, we must determine whether the employer offered a reasonable accommodation to the employee. Ansonia, 479 U.S. at 69. If it did, then "the statutory inquiry is at an end." Id. at 68. If it did not, then we evaluate whether the employee's requested accommodation would cause the employer an undue hardship. Id. at 67. Whether the employer provided a reasonable accommodation

---

[11] Collectively, we will refer to 42 U.S.C. §§ 2000e-2(a)(1) and 2000e(j) as "Title VII's religious discrimination provision."

13

and whether the accommodation would cause an undue hardship are separate inquiries.  Id.

B

We must first determine what constitutes a "reasonable accommodation."  The plain language of the statute directs employers to "reasonably accommodate" religious practices, so "Title VII requires otherwise-neutral policies to give way to the need for an accommodation."  EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 775 (2015).  Indeed,

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices.  Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice."

Id. (quoting 42 U.S.C. § 2000e(j)).  Our task is to determine whether an offered accommodation must eliminate the conflict between a job requirement and the religious practice.

Cases from the Supreme Court and our Court answer this question.  The Supreme Court has stated that an accommodation is reasonable if it "eliminates the conflict between employment requirements and religious practices." Ansonia, 479 U.S. at 70 (holding an accommodation is reasonable where it "allow[s] the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work").  Our

14

Court has said that, where a good-faith effort to accommodate a religious practice has been "unsuccessful," the inquiry must then turn to the undue hardship analysis, which suggests that an accommodation must be effective. Getz v. Pa. Dep't of Pub. Welfare, 802 F.2d 72, 73 (3d Cir. 1986); see also US Airways, Inc. v. Barnett, 535 U.S. 391, 400 (2002) (explaining that "the word 'accommodation' . . . conveys the need for effectiveness"). Thus, a legally sufficient accommodation under Title VII's religious discrimination provision is one that eliminates the conflict between the religious practice and the job requirement. See Getz, 802 F.2d at 74 (holding that a neutral scheduling policy reasonably accommodated employee's religious observance where there was "no conflict" between her employment and observance of religious holidays, such that she was "able to worship fully"); see also Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 226-27 (3d Cir. 2000) (holding that a lateral transfer was a reasonable accommodation where a plaintiff "had not established that she would face a religious conflict" in the new position).

Interpreting "reasonably accommodate" to require that an accommodation eliminate the conflict between a job requirement and the religious practice is consistent with the meaning of the word "accommodate." The word "accommodate" is not defined in the statute, so we apply its ordinary meaning. Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012). To accommodate means "to furnish with something desired, needed or suited"; "to bring into agreement or accord." Accommodate, Webster's Third New International Dictionary 12 (3d ed. 1993); see also Accommodate, Webster's New World College Dictionary 8 (5th ed. 2018) ("to provide (someone) with something needed or desired"; "to reconcile"). To accommodate therefore requires an actor to

15

adapt, adjust, or modify its conduct.  In the context of Title VII, and given the Supreme Court's directive that even neutral policies must be adjusted to ensure their application does not disfavor a person based upon religion, a neutral policy must "give way to" religious practice.  Abercrombie, 575 U.S. at 775.

Several of our sister circuits agree that an accommodation under Title VII's religious discrimination provision must eliminate the conflict between the employee's religious practice and job requirement.[12]  See Morrisette-

---

[12] Other courts examine the religious discrimination provision in different ways.  For example, at least one circuit court has adopted a "totality of the circumstances" approach but has not explicitly addressed whether the offered accommodations must always eliminate the conflict between work and religion.  See Sanchez-Rodriguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 12 (1st Cir. 2012) (adopting a totality of the circumstances approach for determining whether the employer fulfilled its obligation to provide a reasonable accommodation and holding that the employer had accommodated a Sabbath observer where it offered the observer two alternative positions with lower pay and permitted shift swapping).  One circuit seems to adopt at least two approaches.  Compare EEOC v. Universal Mfg. Corp., 914 F.2d 71, 73, 74 (5th Cir. 1990) (holding an employer's accommodation of one aspect of an employee's religion but failure to accommodate another constituted a "selective" accommodation that would be "patently unreasonable" and that Title VII does not permit an employer "under the guise of reasonableness, [to choose] between which religious conflicts that employer will or will not accommodate"), with Bruff v. N.

16

Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1322-23 (11th Cir. 2007) (combining rotating scheduling system, shift change, opportunity to transfer positions, and other accommodations that would "eliminate[] the conflict between employment requirements and religious practices," thus reasonably accommodating a Sabbath observer) (quoting Ansonia, 479 U.S. at 70); Baker v. Home Depot, 445 F.3d 541, 547-48 (2d Cir. 2006) (allowing Sabbath observer to start later on Sundays to attend religious services, but requiring him to come to work, did not permit him to observe his religious requirement to totally abstain from Sunday work and thus offered "no accommodation at all"); EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1576 (7th Cir. 1997) (offering two Jewish employees a day off besides Yom Kippur did not "eliminate the conflict between the employment requirement and the religious practice" and thus was not a reasonable accommodation); Opuku-Boateng v. State of California, 95 F.3d 1461, 1467 (9th Cir. 1996) (explaining that where negotiations between employer and Sabbath observer "do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that it would cause undue hardship"); Cooper v. Oak Rubber Co., 15 F.3d 1375, 1379 (6th Cir. 1994) (offering altered schedule that still required Saturday Sabbath observer to perform some Saturday work was not a reasonable accommodation because it "failed to

---

Miss. Health Servs., Inc., 244 F.3d 495, 500 (5th Cir. 2001) (explaining that an employer must "offer[] an alternative reasonable accommodation to resolve the conflict" between work and religion but that duty to accommodate is met where employee can transfer to a position "where conflicts are less likely to arise").

17

address her principal objection to working on Saturday").[13] For the same reasons, permitting a Sabbath observer to swap shifts would not be a reasonable accommodation if other employees are regularly unavailable to cover a Sabbath observer's shifts.

Other circuit courts have concluded that requiring a total elimination of the conflict ignores Title VII's inclusion of the word "reasonably" as a modifier to the word "accommodate." Firestone Fibers, 515 F.3d at 313; see also Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1031, 1033 (8th Cir. 2008) (explaining that it would be inconsistent with Title VII "to hold that an accommodation, to be reasonable, must wholly eliminate the conflict between work and religious

---

[13] The EEOC generally recognizes a "voluntary swap" as a reasonable accommodation. 29 C.F.R. § 1605.2(d)(1) ("Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap."). In addition, the EEOC "believes that the obligation to accommodate requires that employers and labor organizations facilitate the securing of a voluntary substitute with substantially similar qualifications." Id.

The EEOC, however, has stated that "[a]n adjustment offered by an employer is not a 'reasonable' accommodation if it merely lessens rather than eliminates the conflict between religion and work, provided that eliminating the conflict would not impose an undue hardship." EEOC, Compliance Manual on Religious Discrimination § 12-IV(A)(3) (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_25500674536391610749867844.

requirements in all situations," but also observing that "there may be many situations in which the only reasonable accommodation is to eliminate the religious conflict altogether"). These cases read the word "reasonably" as evaluating matters of degree and not imposing a duty to accommodate at all costs. See Firestone Fibers, 515 F.3d at 313; Sturgill, 512 F.3d at 1031, 1033; see also Tabura v. Kellogg USA, 880 F.3d 544, 551 (10th Cir. 2018) (in a case involving unsuccessful shift swapping, declining to adopt "a per se 'elimination' rule that applies across all circumstances" for reasonable accommodations and remanding for a jury to determine reasonableness). This interpretation, however, merges the concept of "reasonableness" with "undue hardship" even though, as stated above, they are separate inquiries.

USPS similarly misunderstands the interaction between the words "reasonably" and "accommodate." USPS argues that "reasonably" limits the employer's obligation. It asserts that so long as the offered accommodation could, in theory, eliminate the conflict between a job duty and the religious obligation, the employer has fulfilled its Title VII duty even if the accommodation does not eliminate the conflict in practice. Put differently, USPS asserts that so long as the employer offers an accommodation that may work, it has acted reasonably. This argument is inconsistent with Title VII's religious discrimination provision. As interpreted by the Supreme Court, that provision requires the employer to deviate even from neutral practices to ensure an employee's religious beliefs and practices are not infringed. Abercrombie, 575 U.S. at 775. To offer an accommodation that in practice will result in continued infringement does not fulfill Title VII's requirements.

19

In addition to requiring that the accommodation eliminate the conflict, the statute requires that the offered accommodation be reasonable. The word "reasonable" is not defined, so we look to its ordinary meaning. Taniguchi, 566 U.S. at 566. Webster defines "reasonable" to mean "not conflicting with reason; not absurd; not ridiculous; being or remaining within the bounds of reason; not extreme; not excessive." Reasonable, Webster's Third New International Dictionary 1892 (3d ed. 1993). Thus, the word "reasonable" here requires that an adjustment to an otherwise neutral policy need not go beyond what is necessary to eliminate the conflict.

At oral argument, the Government contended that the word "reasonable" in other contexts does not require complete achievement of the action that the word "reasonable" modifies. Oral Argument at 40:29-40:44, Groff v. DeJoy (Jan. 25, 2022), https://www2.ca3.uscourts.gov/oralargument/audio/21-1900_Groffv.DeJoy.mp3. For example, the phrase "reasonable doubt" does not mean that there must be a complete elimination of all doubt to find that the Government has proven the elements of the crime charged. See, e.g., Dunbar v. United States, 156 U.S. 185, 199 (1895) ("[B]y a reasonable doubt you are not to understand that all doubt is to be excluded.") (quoting Miles v. United States, 103 U.S. 304, 312 (1880)); United States v. Isaac, 134 F.3d 199, 203 (3d Cir. 1998) (upholding jury instruction that contrasted "reasonable doubt" with "all possible doubt"). The Government is correct, but context matters.[14] The context in which the word "reasonable" is used informs what it modifies. In the Title VII

---

[14] For this reason, our discussion of the meaning of "reasonably accommodate" in this opinion is limited to Title VII's religious discrimination provision.

religious discrimination context, the word "accommodate" requires the employer to offer an adjustment that allows the employee to fulfill the religious tenet but requires nothing more from the employer. The word "reasonably" informs how an employer provides an accommodation that eliminates the conflict, but it does not obligate the employer to "choose any particular reasonable accommodation," Ansonia, 479 U.S. at 68, or grant an employee's preferred accommodation, Getz, 802 F.2d at 74.

In evaluating whether the avenue is reasonable, we look at the manner in which the accommodation is implemented. For example, paid leave or use of vacation time, Getz, 802 F.2d at 74, unpaid leave, Ansonia, 479 U.S. at 70, transfers, Shelton, 223 F.3d at 226, 228, and shift swapping, Hardison, 432 U.S. at 77-78, are all possible avenues to eliminate a conflict between working on a specific day and observing one's religion on that day. However, some accommodations that eliminate a conflict may still be unreasonable. An employer that provides unpaid personal leave for religious observance may accommodate an employee whose religion forbids work on a particular day, thus eliminating the conflict between work and religion; but if that employer provided paid leave to accommodate other employees with nonreligious work conflicts, we would likely hold the accommodation unreasonable. See Ansonia, 479 U.S. at 71 ("[U]npaid leave is not a reasonable accommodation when paid leave is provided for all purposes except religious ones. A provision for paid leave 'that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all.'") (emphasis and citation omitted).

On the other hand, offering a less desirable shift, position, or location can be a reasonable accommodation. See Shelton, 223 F.3d at 228; see also Sturgill, 512 F.3d at 1033 (explaining that a reasonable jury could find that Title VII's bilateral duty of cooperation may require an employee to "accept a less desirable job or less favorable working conditions"). Even a reduction in salary associated with the accommodation may not necessarily be unreasonable. See, e.g., EEOC v. Walmart Stores E., L.P., 992 F.3d 656, 659-60 (7th Cir. 2021)[15] (offering an hourly rather than a salaried position to accommodate a Sabbath observer was reasonable); Sanchez-Rodriguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 12-13 (1st Cir. 2012) (offering lower-paying positions, allowing shift swapping, and refraining from disciplining an employee for missing work constituted a reasonable accommodation); Bruff v. N. Miss. Health Servs., Inc., 244 244 F.3d 495, 502 n.23 (5th Cir. 2001) (reducing pay is not unreasonable). But see Baker, 445 F.3d at 548 ("[A]n offer of accommodation may be unreasonable 'if it cause[s] [an employee] to suffer an inexplicable diminution in his employee

---

[15] The Supreme Court later granted certiorari, vacated an order denying intervention, and remanded to the Court of Appeals for the Seventh Circuit to take further steps as a result of its ruling in Cameron v. EMW Women's Surgical Center, P.S.C., 595 U.S. ——, 142 S. Ct. 1002 (2022). See Hedican v. Walmart Stores E., L.P., 142 S. Ct. 1357 (2022) (Mem.).

22

status or benefits.'") (quoting <u>Cosme v. Henderson</u>, 287 F.3d 152, 160 (2d Cir. 2002)).[16]

Here, USPS attempted to facilitate shift swaps for Groff on each Sunday that he was scheduled to work.[17] Between March 2017 and May 2018, Groff was scheduled to work on twenty-four Sundays. The Holtwood Postmaster testified that, for each week Groff was scheduled for Sunday work, he sent emails seeking volunteers from other offices. Despite these undisputed good-faith efforts, USPS was unsuccessful in finding someone to swap shifts on twenty-four Sundays over a sixty-week period. Because no coverage was secured and Groff failed to appear for work, he was disciplined. Thus, even though shift swapping can be a reasonable means of

---

[16] Because these cases are fact sensitive, we do not endorse any particular accommodation but rather note an accommodation must be considered on a case-by-case basis based upon the practice required by the sincerely held religious belief and the job duty. <u>See</u> <u>Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.</u>, 877 F.3d 587, 490-91 (3d Cir. 2017) (holding that a sincerely held belief was "not religious and not protected by Title VII" under this Court's definition in <u>Africa v. Commonwealth of Pennsylvania</u>, 662 F.3d 1025, 1032 (3d Cir. 1981)).

[17] USPS also offered other alternatives, such as working on Sundays after attending church services or observing the Sabbath on a day other than Sunday, but neither would allow Groff to fulfill his religious practice of observing the Sabbath by abstaining from work on Sundays. As a result, these options do not constitute "accommodations" under Title VII's religious discrimination provision. USPS does not argue for these options on appeal.

accommodating a conflicting religious practice, here it did not constitute an "accommodation" as contemplated by Title VII because it did not successfully eliminate the conflict.

As a result, we next consider whether exempting Groff from Sunday work—which would eliminate the conflict—would result in an undue hardship.

C

An employer is not required "to accommodate at all costs." Ansonia, 479 U.S. at 70. Where an employer's good-faith efforts to accommodate have been unsuccessful, the inquiry turns to whether the employer demonstrated that "such an accommodation would work an undue hardship upon the employer and its business." GEO Grp., 616 F.3d at 271. "An 'undue hardship' is one that results in more than a de minimis cost to the employer."[18] Id. at 273. Both economic and non-economic costs suffered by the employer can constitute an undue hardship. Id. The undue hardship analysis is case-specific, requiring a court to look to "both the fact as well as the magnitude of the alleged undue hardship," though it is "not a difficult threshold to pass." Id. (quoting Webb, 562 F.3d at 260).

---

[18] Hardison held that requiring an employer "to bear more a than a de minimis cost" to provide a religious accommodation is an undue hardship, Hardison, 432 U.S. at 84, and we are bound by this ruling, see Walmart Stores E., L.P., 992 F.3d at 660. The impact on the workplace here, however, far surpasses a de minimis burden.

24

Examples of undue hardships include negative impacts on the employer's operations, such as on productivity or quality, personnel and overtime costs, increased workload on other employees, and reduced employee morale.[19] See, e.g., Walmart Stores E., L.P., 992 F.3d at 659 (noting that "Title VII does not require an employer to offer an 'accommodation' that comes at the expense of other workers" and concluding undue hardship as shown where employer demonstrated that proposed accommodations would require "more than a slight burden when vacations, illnesses, and vacancies reduced the number of other" employees available); Harrell v. Donahue, 638 F.3d 975, 980-81 (8th Cir. 2011) (giving postal worker Saturdays off constituted an undue hardship because it would have burdened co-workers with more weekend work); Firestone Fibers, 515 F.3d at 317 ("[W]hen determining the reasonableness of a possible accommodation, it is perfectly permissible for an employer to consider the impact it would have on . . . other employees."); Virts v. Consol. Freightways Corp. of Del., 285 F.3d 508, 520-21 (6th Cir. 2002) (holding that accommodations that would potentially adversely impact other employees by causing them to receive less profitable routes or less time off between routes amounted to undue hardship); Bruff, 244 F.3d at 501 (holding that requiring coworkers to "assume a disproportionate workload," or for employer to overschedule employees to provide accommodation, "is an undue hardship as a matter of law" and "clearly involve[s] more than de minimis cost," after considering size of the staff and the nature of the employer's

---

[19] A business may be compromised, in part, if its employees and poor morale among the work force and disruption of work flow. This, of course, could affect an employer's business and could constitute undue hardship.

business); Opuku-Boateng, 95 F.3d at 1468 (acknowledging that an employer may show either "hardship on the plaintiff's coworkers" or on the conduct of the business to demonstrate undue hardship); Brown v. Polk Cnty, Iowa, 61 F.3d 650, 656-57 (8th Cir. 1995) (en banc) (concluding no undue hardship where conduct created potential for polarization amongst staff, but did not result in any "actual imposition on co-workers or disruption of the work routine") (quoting Burns v. S. Pac. Transp. Co., 589 F.2d 403, 407 (9th Cir. 1978)); Eversley v. MBank Dallas, 843 F.2d 172, 176 (5th Cir. 1988) (concluding it was "unreasonable and an undue hardship on an employer to require the employer to force employees, over their express refusal, to permanently switch from a daytime to a nighttime shift in order to accommodate another employee's different Sabbath observation"); Brener v. Diagnostic Ctr. Hosp., 671 F.2d 141, 147 (5th Cir. 1982) (holding there was undue hardship where forced shift trades "resulted in disruption of work routines and a lowering of morale" among coworkers and employer was "also harmed because its employees are compelled to accept less favorable working conditions"); cf. Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710 & n.9 (1985) (acknowledging that "[o]ther employees who have strong and legitimate, but non-religious, reasons for wanting a weekend day off" would be "significant[ly] burden[ed]" if Sabbath observers were granted an absolute right not to work on their Sabbath); Wilson v. U.S. W. Commc'ns, 58 F.3d 1337, 1341-42 (8th Cir. 1995) (explaining that requiring religious employee's coworkers to accept her practice of wearing a button with a  photograph of a fetus was "antithetical to the concept of reasonable accommodation" because employee's

beliefs were imposed on coworkers and disrupted workplace).[20]

Groff's proposed accommodation of being exempted from Sunday work would cause an undue hardship. Exempting Groff from working on Sundays caused more than a de minimis cost on USPS because it actually imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale at both the Holtwood Post Office and the Lancaster Annex hub. The Holtwood Post Office to which Groff was assigned had only a postmaster and three RCAs (including Groff) available for Sunday deliveries. Because Groff would not work on Sundays, only three individuals remained who could work on Sundays during the peak season. After the one RCA who covered for Groff was injured, only the Holtwood Postmaster and the remaining RCA were available to work the Sunday shift. This placed a great strain on the Holtwood Post Office personnel and even resulted in the Postmaster delivering mail on some Sundays. The Holtwood Postmaster testified, "[o]ther carriers were being forced to cover [Groff's] shifts and give up their family time, their ability to attend church services if they would have liked

---

[20] The EEOC also recognizes that impacts on coworkers may constitute an undue hardship under Title VII. EEOC, Compliance Manual on Religious Discrimination § 12-IV(B)(4) (2021), https://www.eeoc.gov/laws/guidance/section -12-religious-discrimination#h_25500674536391610749867844 (explaining that "general disgruntlement, resentment, or jealousy of coworkers will not" constitute undue hardship, which "generally requires evidence that [an] accommodation would actually infringe on the rights of coworkers or cause disruption to the work").

to," and these additional demands "created a tense atmosphere with the other RCAs." JA464.

At the hub, Groff's absences also had an impact on operations and morale. The hub supervisor testified that Groff's absence made timely delivery more difficult, and carriers had to deliver more mail. As at the Holtwood Post Office, Groff's absence also had a negative impact on morale among the RCAs at the hub and resulted in a Union grievance being filed. According to management, allowing Groff to swap shifts was the only accommodation that would not impact operations and exempting him from the rotation would result in other employees "do[ing] more than their share of burdensome work." JA218; see also JA468, 492, 599. Thus, Groff's absences caused, and exempting Groff from Sunday work would continue to cause, an undue hardship.

Because exempting Groff from Sunday work caused undue hardship, USPS did not violate Title VII by declining to grant his accommodation.

IV

For the foregoing reasons, we will affirm.

28

*Gerald E. Groff v. Louis DeJoy, Postmaster General USPS,*
No. 21-1900

_____

HARDIMAN, *Circuit Judge*, dissenting.

The United States Postal Service offered Gerald Groff an accommodation that failed to eliminate the conflict between his religious practice and job requirements. I agree with my colleagues that such an accommodation cannot be "reasonable" under Title VII. Judge Shwartz's cogent analysis follows Supreme Court precedent in clarifying what it means to "reasonably accommodate" an employee's religious observance or practice, 42 U.S.C. § 2000e(j). A reasonable accommodation must "eliminate[] the conflict between employment requirements and religious practices." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). This rule puts us on the right side of an unresolved circuit split involving Title VII religious accommodation. *See* Maj. Op. at 16–19 & n.12.

But without more facts, I cannot agree that USPS has established "undue hardship on the conduct of [its] business" by accommodating Groff's sincerely held religious belief. 42 U.S.C. § 2000e(j); *see* Maj. Op. 28 ("Because exempting Groff from Sunday work caused undue hardship, USPS did not violate Title VII by declining to grant his accommodation."). Title VII requires USPS to show how Groff's accommodation would harm its "*business*," not Groff's coworkers. 42 U.S.C. § 2000e(j) (emphasis added). USPS has yet to satisfy that burden on this record. The Majority cites cases echoing the District Court's observation that "[m]any courts have

1

recognized that an accommodation that causes more than a *de minimis* impact on co-workers creates an undue hardship." *Groff v. DeJoy*, 2021 WL 1264030, at *12 (E.D. Pa. Apr. 6, 2021). Yet neither our Court nor the Supreme Court has held that impact on coworkers alone—without showing business harm—establishes undue hardship. *See* Maj. Op. at 25–27.

USPS ultimately may be able to prove that accommodating Groff would have caused its business to suffer undue hardship. Because it has not yet done so, I respectfully dissent in part.[1]

---

[1] The decision to remand should have been easier for our panel to make, since USPS has not yet established "undue hardship on the conduct of [its] business." 42 U.S.C. § 2000e(j). It's not that simple, because *TWA v. Hardison*, 432 U.S. 63 (1977), obliges us to depart from Title VII's text and determine whether accommodating Groff's religious practice would require USPS to "bear more than a de minimis cost." *Id.* at 84. The Majority may be correct; perhaps *anything* that keeps a postmaster at work during Christmastime can be considered "more than a de minimis cost" to USPS under *Hardison*'s capacious standard. But such a de minimis impact on USPS seems rather far afield from the text of Title VII. The Supreme Court has not yet clarified what it means for an employer to "bear more than a de minimis cost" when accommodating an employee's sincerely held religious belief. Like Justice Marshall, "I seriously question whether simple English usage permits 'undue hardship' to be interpreted to mean 'more than de minimis cost,'" particularly when such a reading can "effectively nullify[]" Title VII's promise of religious accommodation. *Id.* at 89, 93 n.6 (Marshall, J., dissenting).

2

I

In deciding Groff's case, the District Court inferred an atextual rule from Title VII: "an accommodation that causes more than a *de minimis* impact on co-workers creates an undue hardship." *Groff*, 2021 WL 1264030, at *12 (observing that "[m]any courts have recognized" such a rule).[2] The Majority gathers cases—all from other circuits—affirming that rule, but without an important correction to the District Court's analysis. Maj. Op. at 25–27. Simply put, a burden on coworkers isn't the same thing as a burden on the employer's business. And Title VII requires an employer to show "undue hardship on the conduct of [its] *business*" by accommodating an employee's sincerely held religious belief. 42 U.S.C. § 2000e(j) (emphasis added). Neither Supreme Court nor Third Circuit precedent establish a derivative rule that equates undue hardship on business with an impact—no matter how small—on coworkers.

Title VII requires USPS to show how Groff's accommodation would harm its *business*, not merely how it would impact Groff's coworkers. By affirming the District Court's atextual rule, the Majority renders *any* burden on employees sufficient to establish undue hardship, effectively subjecting Title VII religious accommodation to a heckler's

---

[2] None of the cases cited by the District Court bind us. In fact, the only Third Circuit case—which was nonprecedential—considered how an accommodation that "would result in unequal treatment of the other employees and negatively affect employee morale" may support a claim of undue hardship. *Aron v. Quest Diagnostics Inc.*, 174 F. App'x 82, 83 (3d Cir. 2006).

3

veto by disgruntled employees. Even USPS is unwilling to go that far.[3]

While it may ultimately be able to prove such undue hardship—"one that results in more than a de minimis cost to the employer," *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010)—USPS did not satisfy its burden at the summary judgment phase. Speculative, or even actual, effects on USPS employees in Lancaster or Holtwood cannot suffice to prove undue hardship. And taking all inferences in Groff's favor, as required at summary judgment, issues of material fact remain regarding USPS's claims related to RCA scheduling and overtime. Accordingly, I would remand so the District Court could evaluate those factual issues before concluding that USPS's business would suffer undue hardship by accommodating Groff.

A

I begin with USPS's claim that skipping Groff on Sundays would result in "fewer days off for the other RCAs." DeJoy Br. 57. Even if we accept its math—which seems debatable, given the possibility of Groff working every

---

[3] Before settling, USPS repeatedly denied its employee's 2017 Union grievance for this very reason. As the Majority notes, the Lancaster RCA grieved that "he was being 'forc[ed]' to work on Sundays while others were not being required to work." Maj. Op. 9 n.8 (citing App. 501). In response, USPS management asserted that the RCA's contractual employment rights were not violated by Groff's religious accommodation. App. 512 ("Management's position is that no contractual violation exists in this case.").

4

Saturday and holiday that doesn't fall on Sunday—the claim does not support USPS's argument. An employer does not establish undue hardship by pointing to a more-than-de-minimis impact on an employee's coworker. As I noted already, Title VII concerns undue hardship on the employer's *business*. *See* 42 U.S.C. § 2000e(j).

The Majority rightly notes that "Groff was scheduled to work on twenty-four Sundays" between March 2017 and May 2018. Maj. Op. at 23. But most of those Sundays were during non-peak season, when Groff would have been assigned to work at the Lancaster Annex hub, not his home station in Holtwood. The Lancaster Annex hub drew RCAs from all over the region, any of whom could be assigned to work on Sundays. So during non-peak season, Groff's supervisors had access to many more RCA replacements for Groff. During those ten months, USPS management could rely on regional RCAs to cover Groff's Sunday shift, or simply avoid scheduling him in the first place, knowing that any RCA affiliated with the Lancaster Annex had to be available for Sunday work.[4]

---

[4] On this point, I find assertions made by USPS management about the Lancaster Annex—upon which the Majority relies in finding undue hardship—too speculative to be dispositive. *See* Maj. Op. 28 ("According to management, allowing Groff to swap shifts was the only accommodation that would not impact operations and exempting him from the rotation would result in other employees 'do[ing] more than their share of burdensome work.'" (quoting App. 218)); *see also* App. 218 ("Manager Zehring declared that allowing some substitutes to be exempt from working Sundays would . . . pose an undue burden when requiring other employees to do more

5

Groff's accommodation created a predicament for the Holtwood Postmaster between Thanksgiving and New Years, since he could assign only Holtwood-based RCAs to cover Groff's local delivery routes. Even so, an employer does not establish undue hardship by pointing to a more-than-de-minimis impact on an employee's coworker. Without more evidence, USPS cannot rely on the limited experience of the Holtwood station at Christmastime to establish that its business would suffer undue hardship by accommodating Groff. At trial, the District Court could clarify whether scheduling difficulties created an undue hardship on USPS's business, not simply its Postmaster in Holtwood or certain Lancaster Annex RCAs.

## B

Second, USPS cites testimony from Groff's former Postmaster to claim that "when Groff did not work on Sundays it caused overtime at the Holtwood station." DeJoy Br. 59. But where is the documentation of paid overtime wages? USPS has provided none. In fact, its corporate representative acknowledged that she had no idea whether overtime costs were incurred to accommodate Groff. The representative also conceded that scheduling an extra RCA in advance to take Groff's place on Sundays would not harm USPS; Groff's former postmaster acknowledged the same in his email to USPS Labor Relations.

---

than their share of burdensome work."). USPS has provided no evidence that RCAs did "more than their share" of work they were hired to perform. And USPS management repeatedly denied the one Union grievance its Lancaster RCA filed in 2017. *See supra* note 3.

6

We cannot assume that USPS paid overtime it would not have otherwise owed another RCA to cover for Groff. The parties stipulated that every RCA received overtime pay for working Sundays and holidays, whether or not they were covering for Groff. Since Groff would have been paid overtime for Sunday work, any salary that would have been owed him had he worked Sundays should have been used to pay another RCA, resulting in no additional cost to USPS.

I also note that an obligation to pay overtime "only at Holtwood during peak season," DeJoy Br. 59—no more than six Sundays, presuming Groff was assigned each Sunday between Thanksgiving and New Years in 2017—might be insufficient to establish undue hardship. EEOC regulations "presume that the infrequent payment of premium wages for a substitute . . . are costs which an employer can be required to bear as a means of providing a reasonable accommodation." 29 C.F.R. § 1605.2(e)(1).

More evidence is needed to resolve this question of Sunday overtime pay. When combined with USPS's failure to identify any concrete evidence of overtime costs, and its own witnesses' admissions, an issue of material fact precludes summary judgment. At trial, the District Court could determine whether USPS incurred overtime costs when Groff wasn't scheduled on Sundays and, if it did, whether those costs resulted in an undue hardship on the conduct of its business.

In sum, Title VII requires USPS to show how Groff's accommodation would harm its business. Inconvenience to Groff's coworkers alone doesn't constitute undue hardship. USPS may be able to prove such undue hardship at trial. But taking all inferences in Groff's favor at summary judgment, multiple issues of material fact remain. I would remand so the

7

District Court can determine whether USPS suffered an undue hardship.

## II

Neither snow nor rain nor heat nor gloom of night stayed Gerald Groff from the completion of his appointed rounds. But his sincerely held religious belief precluded him from working on Sundays. Because USPS has not yet shown that it could not accommodate Groff's Sabbatarian religious practice without its business suffering undue hardship, I respectfully dissent. The cause should be remanded for a trial on the question of undue hardship.